SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY
-----------------------------------------------------------X
PEOPLE OF THE STATE OF NEW YORK,

      - against –

                **NOTICE OF**
                **MOTION**

GIGI JORDAN,
             Defendant.          Ind. No: 00621/10
-----------------------------------------------------------X

      PLEASE TAKE NOTICE, that upon the Affirmation of Ronald L. Kuby, dated

October 29, 2014, and the proceedings had heretofore, the accused herein GIGI

JORDAN, by and through counsel, will move this Court, at a Criminal Term, Part 82,

100 Centre Street, New York, New York, at a time and date to be determined by this

Court, for an Order granting a mistrial pursuant to N.Y.C.P.L. §280.10(1).

Dated:       New York, New York
          October 29, 2014

                         YOURS, ETC.,

                         /s/ Ronald Kuby

                         Ronald L. Kuby, Esq.
                         119 West 23rd Street, Suite 900
                         New York, New York 10011
                         (212) 529-0223
                         ronkuby@aol.com

TO:
ADA Matthew Bogdanos

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY:  PART 82

------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-                                                                          Ind. 621-10

GIGI JORDAN,

                                     Defendant.

------------------------------------------------------------------x

## AFFIRMATION IN SUPPORT OF MOTION FOR A MISTRIAL

State of New York)
                    ss:
New York County)

      Ronald L. Kuby, an attorney duly admitted to practice in the Courts of the

State of New York, and counsel for Defendant herein, hereby affirms, under the

pains and penalties of perjury, as follows:

## **Introduction**

1.     Defendant Gigi Jordan moves, pursuant to N.Y.C.P.L. § 280.10(1), for a

mistrial based upon the cumulative effect of multiple errors of law, all of which

have impeded, curtailed, and otherwise obstructed the presentation of her defense

of Extreme Emotional Disturbance.  Moreover, the prosecution, during summation,

repeatedly made arguments that highlighted the lack of defense evidence on crucial points, all the while knowing that such evidence not only existed, but that the prosecution had obtained rulings excluding such evidence on the very grounds that they undercut during closing argument. The cumulative effect of these errors has been to deprive Ms. Jordan of (1) a fair trial in violation of her rights under the Fourteenth Amendment to the Constitution of the United States, and (2) her right to present a defense, in violation of her rights under the Sixth and Fourteenth Amendments to the Constitution of the United States.

### The Exclusion of Evidence Related to Raymond A. Mirra Jr.

2.     The single most important piece of evidence that would tend to establish the objective reasonableness of Ms. Jordan's fear that Raymond A. Mirra, Jr. ("Mirra") would kill her was Court Exhibit 10 (attached hereto); a report made by the highly-regarded investigative firm Intefor. The firm was founded by Juval Aviv, a former member of the Israeli intelligence service (Mossad) and the planner of operation "Wrath of God," popularized in the Stephen Spielberg film *Munich*.

3.     In early 2008, in response to Ms. Jordan's fears that Mirra and his associate Louis Schipani, were dangerous and associates of organized crime, her attorney Mark Petersen commissioned Interfor to investigate the men. A Supplemental

Report, dated May 1, 2008, prepared by Interfor and sent to Ms. Jordan soon after, contained the following information:

> Interfor has now received confirmation that Raymond Mirra and Luis Schipani are on file with the US government as "associates of organized crime". Interfor's sources have determined that this is a very broad, family-based affiliation and not a criminal affiliation.

Court Exhibit 10. Had she been permitted to testify about this Supplemental Report, Ms. Jordan would have testified that she interpreted it to mean that the U.S. Government considered Mr. Mirra to be an "associate" of organized crime. Her understanding of the term "associate" was Mirra was not a "made" or full member, but worked, and shared common goals, with such full members. Ms. Jordan would have further testified that she recognized that Interfor's view was somewhat different than the U.S. Government's view, and that Interfor viewed the association to mean that Mirra has family members who are members of organized crime.

4.      The Court, in error, refused to permit Ms. Jordan to testify about the Supplemental Report, and further in error, refused to allow the Supplemental Report into evidence. The Supplemental Report was certainly the type of evidence that a reasonable person, in Ms. Jordan's position, could consider as objective proof that Mirra posed a real danger to her, and that her fears were not fantasies or delusions. Such evidence should have been admitted to show the objective reasonableness of Ms. Jordan's state of mind.

5.      In denying the admission of the Supplemental Report, this Court ruled: "I'm not allowing the question about Ray Mirra being a member of organized crime, because there is no evidence he is." (Tr., Oct. 15, 2014, at 3166-3167).  But the Supplemental Report was not offered for the truth of Mirra's relationship to organized crime, but rather to show Ms. Jordan's state of mind and as proof that her fears were objectively reasonable.

6.      It is hornbook law when a defense is based on a defendant's state of mind, the defendant must be permitted to testify about the things that she read, knew, or heard that influenced her mental state—regardless of whether that information was correct.  When an element of the defense requires objective reasonableness (as measured from the perspective of the defendant), the defendant is not and cannot be limited to meeting this element by her testimony alone.  A defendant must be able to introduce the evidence that she relied upon, or which corroborated her perception.  In other words, a defendant must be permitted to prove the actual existence of this information.  Thus, in People v. Frazier, 6 A.D.3d 455 (2d Dept. 2004), the defendant, asserting justification, testified that he saw the victim smoking a "PCP cigar" before the attack.  The Second Department held that it was error for the trial court to exclude the toxicology report that showed the victim had PCP in his system and error to exclude an expert on the effect of PCP on human behavior, as this proof went to establish the objective reasonableness of the

defendant's perceptions.  Similarly, in People v. Chevalier, 220 A.D.2d 114 (1st

Dept. 1996), the First Department reversed the trial court in a second degree

murder case for excluding evidence that the decedent had alcohol, cannabis, and

cocaine in his body.  The First Department explained that this exclusion was

particularly harmful in light of the prosecution's closing statement that the

defendant's version of the facts and justification defense were based on

speculation, unsupported by any evidence "other than defendant's testimony

alone." Id. at 117.   See also People v. Manzella, 199 A.D.2d 964 (4th Dept. 1993)

(Defendant failed to sustain his burden of proving EED in the murder of two police

officers.  Although the defendant testified that one of the officers had previously

abused and threatened him four months earlier, the Fourth Department noted, "No

competent evidence was received concerning the actions of the police

officer.  Neither defendant nor anyone else present at the police interrogation

testified about what happened . . . .").

7.      The Court's error in refusing admission of highly relevant state-of-mind

evidence on the ground there was no other evidence that Mirra was associated with

organized crime was baffling and this error was further compounded by the

Court's exclusion of the testimony of Juval Aviv.  Mr. Aviv, who oversaw the

investigation, would have testified about the nature and extent of Mirra's ties to

organized crime.  Thus, the Court wrongfully excluded the Supplemental Report

because the facts therein were not true, and then excluded the witness that could have attested to their truthfulness.

8.     Accentuating these errors was the Court's refusal (1) to allow Ms. Jordan to testify about the Mirra-created forgeries that fraudulently transferred money out of the Hawk Mountain Trust account and other bank accounts, and (2) to allow the actual documents bearing forgeries of Ms. Jordan's signature into evidence. But Ms. Jordan's realization that Mirra had been stealing substantial funds played an essential part in her final confrontation with him; a confrontation that began with her confronting him about the thefts and ending with him threatening to kill her. As a result of the exclusions of such evidence, the jury has been presented with an artificially-sanitized portrayal of Mirra, without any objective basis to fear him. Having engineered the exclusion of all of this relevant evidence that provided an objective basis for Ms. Jordan's fears, the prosecutor then exploited the Court's error by arguing during summation as follows: "So one last point about EED. In order to accept it, it relies on her credibility and reliability. She's the source. Ms. Jordan is the source. . . . Did she believe Ray . . . . Is it reasonable for Ray . . . . You have to believe her." (Tr., Oct. 27, 2014, at 4507).

## **Exclusion of Gigi Jordan's Suicide Letter and Testimony Relevant Thereto**

9.      As the Court is aware, prior to attempting to take her own life and causing her son's death, Ms. Jordan composed a detailed suicide letter in which she set forth the various horrors that she and her son had been forced to endure at the hands of both Tzekov and Mirra.  She then sent the letter to law enforcement agencies and media outlets before she lapsed into unconsciousness.  When she was roused from unconsciousness, Ms. Jordan informed the police that her account of what happened was on the computer.

10.     The writing and emailing of the suicide letter was one of the last acts Ms. Jordan undertook as she was attempting to end her own life.  It is clear evidence about her state of mind at the most proximate time to her son's death.  The Court, again in error, refused to permit the suicide letter into evidence on the ground that it was hearsay.  The hearsay objection, however, was inapposite as the letter was not offered for the truth of the matters asserted therein, but rather, as a portrait of Ms. Jordan's state of mind—her fear and her desperation, at the time of the tragedy.

11.     Nor was this crucial error cured by allowing Ms. Jordan to testify about the acts she described in the suicide letter, without referring to it.  During their summation, the prosecution argued that the account Ms. Jordan provided to the jury was the result of a post-arrest fabrication:

7

MR. BOGDANOS: But then at 12:45 she says how do I know he's dead, he's suffered enough, he has ulcers, my husband is vindictive. What? That is the complaint? He has ulcers, that is it. Where is all this other stuff, where is all this—

MR. WARD: Objection

THE COURT: Overruled.

MR. BOGDANOS: Where is all this, where is all the other complaints that somehow miraculously appears when she testifies. Where is all the other things about Ray Mirra? He has ulcers. Is that what affected her state of mind. She kill him because he had ulcers.

(Tr., Oct. 27, 2014, at 4526-4527).[1] Of course, as the prosecutor knew, the "other stuff" was in the suicide letter, which was excluded from evidence, and "all the other things about Ray Mirra" were both in the suicide letter and in the evidence described above, also excluded. It is fundamentally unfair, and more than a little disingenuous, for the prosecution to argue post-arrest fabrication on summation only after securing a ruling that excluded the very evidence establishing that Ms. Jordan made these complaints prior to her arrest.

12.    As noted above, defense counsel duly objected but the Court overruled the objection. At this late stage of the trial, this error can still be cured by permitting the re-opening of testimony by Ms. Jordan, and introducing the suicide letter, as

---

[1] The prosecution also asserted "So the question is, did she believe any of these claims she's telling you now, that she's saying now? I'm going to say that again. That she's saying now, after she killed him. Now. After February 5th of 2010 everything gets blamed on Ray Mirra." (Tr., 4504). Asserting that Ms. Jordan never believed the things she attested to would be fair argument. However, asserting that she only made these things up "after she killed him" and only blamed Mirra "[a]fter February 5, 2010" is improper argument based on erroneous exclusion of the very evidence that would have made the argument impossible.

well as the Interfor Supplemental Report and proof of the Hawk Mountain

forgeries.  Should the Court decline to so rule, a mistrial is the only remedy for this

cumulative set of errors.

## The Exclusion of Prospective Witness Dr. Dirk Dhossche

13.     Dr. Dirk Dhossche, the chief of psychiatry at the University of Mississippi

Medical Center, was the last physician to examine and treat Jude Mirra.  His

testimony would have explained Jude's dramatically fluctuating presentation—

looking more "autistic" and less "autistic" as consistent with having become more

or less catatonic—a psycho-neuromotor illness that Dr. Dhossche diagnosed in

Jude in 2009.  Most important, Dr. Dhossche would have been able to explain the

link between Jude's condition and its etiology in persistent trauma; including

trauma such as sexual abuse.  Moreover, Dr. Dhossche would have been able to

explain to the jury, among other things, that the 2009 video showing Jude in a

worse or more "regressed" looking condition than in the 2005 video (after Emil

had been gone for over a year) reflected the effects and worsening of Jude's

condition, which were the result of the severe abuse he suffered once Emil returned

in 2007, and particularly when Jude began talking and revealing the abuse in

December of 2007.

14.     Once again, the prosecution exploited its own successful attempts to exclude

highly relevant evidence by presenting  conclusions to the jury that this evidence

would have refuted.  One of the prosecutor's main themes on summation was that

Jude was not sexually abused, and the proof of that was "[n]o doctor whoever

treated Jude in his lifetime found evidence of sex abuse, none." (Tr., Oct. 27, 2014,

at 4469).  The prosecutor then went on to list every medical institution that treated

Jude, including the "University of Mississippi for the electroconvulsive shock

therapy" (id.), asking rhetorically "What does every single institution on that list

have in common?"  (Id. at 4470).  The prosecutor then supplied the answer:  "They

never found evidence of sex abuse.  Never.  Nobody, not a single human being on

the planet whoever actually examined Jude found evidence of sex abuse."  (Id. at

4470-4471).  Of course, Dr. Dhossche's testimony would have made this argument

impossible, but he was excluded on "relevance" grounds.

### The Exclusion of Prospective Witness Dr. Josephine Elia

15.     Dr. Josephine Elia was the physician who performed the plasmapheresis

treatment on Jude at Children's Hospital of Philadelphia ("CHOP").  She would

have testified as to the treatments Jude received, why she did not believe he was

autistic,[2] and that it was impossible to assess the intellectual abilities of a non-

---

[2] Both Drs. Dhossche and Elia would have testified as to why they did not believe that Jude was
autistic.  Instead of actual medical testimony, the prosecution produced Rita Cristman and used
her non-expert exclamation "he's fucking autistic" to argue that Ms. Jordan simply could not

verbal child.  The Court, on its own initiative, raised the issue of whether Dr. Elia

had discovered any evidence that Jude had been abused:

> THE COURT: Before they filter someone's blood had that plasmapheresis
> down in CHOP, in Philadelphia, you don't think they give him a full
> thorough examination pre-op, are you kidding me, are you serious?
>
> MR. BRENNER: Do I think they examine?
>
> THE COURT: Every inch of his body.
>
> MR. BRENNER: Anal opening, no, I don't think they do.
>
> THE COURT: No one?
>
> MR. BRENNER: Perhaps if you let Doctor Elia testify from CHOP she will
> tell you that.

(Tr., Oct. 15, 2014, at 3198).  The Court excluded her testimony on relevance

grounds, in accordance with the prosecution's objection.  Having made sure that

Dr. Elia would not be able to testify about the absence of a sex abuse examination,

the prosecutor then was able to make an argument that he knew was untrue, based

upon the evidence he was able to exclude:

> These were serious operations, plasmapheresis, that is a serious operation.
> You are telling me before they apply the anesthesia, before they took him in
> to have that kind of operation, they did not do a full body workup? . . .
> They didn't do a full workup on Jude?  And what did they find, this . . . is
> when the sex abuse is going on, this is when half the neighborhood

---

accept the "fact" that Jude was autistic and could not be cured.  Indeed, based on Ms. Cristman,
the prosecution cobbled together Ms. Jordan's "real" motive for the murder—which would have
not have been a viable argument had Jude's treating doctors been able to testify.

> according to Ms. Jordan is sexually abusing Jude, Children's Hospital of
> Philadelphia missed it when they had him there.

(Tr., Oct. 29, 2014, at 4469).  It is hard to imagine a greater affront to fundamental

fairness than for the Court to exclude evidence as to what actually did happen at

CHOP, then permit the prosecution to make up a story about what he knew did not

happen.  Further, Dr. Elia's testimony would have undercut another main theme of

the prosecution's argument—that Jude lacked the intellectual abilities to author

many of the emails and writings attributed to him.

### The Exclusion of Prospective Witness Dr. Bessel Vanderkolk

16.    Dr. Bessel Vanderkolk is the co-principal investigator in the PTSD field

trials for the fourth edition of the *Diagnostic and Statistical Manual of Mental

Disorders (DSM-IV)*.  He is a Professor of Psychiatry at the Boston University

Medical Center.  Dr. Vanderkolk would have testified about his work in the area of

"developmental trauma disorder" (DTD), and his studies that have shown that

some children identified by experts as developmentally delayed or autistic are in

fact evincing the effects of severe and prolonged physical and/or sexual abuse from

an early age.  Dr. Vanderkolk would have provided testimony about the differential

diagnosis between the traumatized child and a typically autistic child.  Many of the

factors of differentiation Dr. Vanderkolk described would corroborate traits that

Jude exhibited, thereby providing additional evidence, outside of Ms. Jordan's testimony, that Jude was sexually abused.

### The Exclusion of Prospective Witness Darlene Hanson

17.      The Court wrongfully excluded testimony of Darlene Hanson that would have picked up where the improper exclusion of Dr. Elia left off.  Darlene Hanson has <u>trained</u> hundreds of non-verbal children and young adults, as well as their parents, and communication partners, how to communicate through alternative methods like typing.  Ms. Hansen would provide testimony that many non-verbal individuals who appear unable to express complex thoughts due to a disorganized neuro-motor presentation, are in fact, when afforded the support and means to communicate, capable of communicating at levels evincing higher than average intelligence.  The testimony of Ms. Hansen would have allowed the jury to understand how a child such as Jude, who was perceived by some and portrayed at trial as low-functioning intellectually as a result of his sporadic bouts of disorganized neuro-motor function (caused by catatonia), could communicate at a higher intellectual level than typical for his age.  Such testimony would have provided an expert basis to refute the pages of scoffing argument, (Tr., Oct. 27, 2014, at 4473-4479) made by the prosecution with respect to both Jude's ability to type and his level of intellectual functioning.

### The Exclusion of Evidence Relevant to the Authenticity of Ms. Jordan's Suicide Attempt

18.     This Court ruled, on the basis of unsworn and unsigned assertions made by multiple prosecutors in a Memorandum of Law, that the prosecution could not be faulted for the loss of the blood sample because they never had legal custody of the blood sample.  The defense maintained then, and maintains now, this ruling was wrong—Bellevue retained the blood beyond five days from the time it was drawn only because the prosecution requested it do so.  There was no medical reason to retain the blood, and Bellevue would have disposed of the blood in the ordinary course of business had the prosecution not issued its February 5, 2010 letter. Hence, the blood was in the legal custody of the prosecution.

19.     Notwithstanding this erroneous ruling, the Court acknowledged that the jury was likely to speculate as to why tests were not done to determine the amount of drugs Ms. Jordan ingested.  As the defense noted, if the jury believed that Ms. Jordan's suicide attempt was feigned, that alone would doom an EED defense. Accordingly, this Court first ruled prior to trial that the defense would be able to present evidence as to the blood sample, then *sua sponte* reversed that ruling.  The Court effectively insured that the jury would not receive important, relevant evidence as to what tests were and were not done lest those facts force the Court to reconsider its earlier erroneous ruling.

20.     Of course, the prosecution had the option of stipulating to the legitimacy of Ms. Jordan's suicide attempt.  OOf course, the prosecution would not.  Of course, the prosecution exploited the erroneous exclusion of this evidence, arguing:

> And my goodness, she had enough drugs in that room to kill a platoon, let alone a single individual.  So if she really wanted to kill herself, she would have.  What is the best evidence that she did not try, she is sitting here before you today.

(Tr., Oct. 27, 2014, at 4452).

21.     This Court erroneously excluded the testimony of **Dr. Jessica Pearson**, who would have afforded the defense the opportunity to show that there were hospital records two days after Ms. Jordan was arrested reflecting that there was a positive urine toxicology sample for benzodiazepines and that such sample was not available to the defense.

22.     The Court erroneously excluded the testimony of **Neil Peckman,** who would have testified, *inter alia,* that he personally segregated the remnant of blood obtained from Ms. Jordan before it was discarded.  He did so at the request of the New York County DA's Office.  He was expecting a warrant or court order regarding the disposition of this sample, which never came.  At some point on April 14, 2010, he resealed the blood sample, placed it in storage, and never saw it again.

23.     The Court erroneously excluded the testimony of **Dr. Donald B. Hoffman,** a twenty-seven-year veteran toxicologist from the Manhattan OCME, who would

have testified that the loss of the Defendant's blood was due to the failure of the ADA, who was present to request and assure that the hospital draw the appropriate blood and urine specimens, specific for toxicology, and properly secure and store said specimens for subsequent thorough analysis.  He would have further testified that the ADA had a responsibility to then follow up with the OCME's office and make available the test results to the defense.  He would have explained that this was a gross departure from the normal procedures followed in his twenty-seven years of experience at the OCME working on such cases.  As a result of this failure, the defense was deprived of the best evidence that Ms. Jordan's suicide attempt was genuine and that she did in fact take sufficient quantities to kill herself that night.

## Conclusion

24.    For the foregoing reasons, it is respectfully requested that this Court grant a mistrial.

Respectfully submitted,

/s/ Ronald Kuby

Ronald L. Kuby

Dated:        New York, NY
              October 29, 2014

# EXHIBIT



AMSTERDAM

BOSTON

BUENOS AIRES

CARACAS

COPENHAGEN

FRANKFURT

HONG KONG

LONDON

LOS ANGELES

MADRID

MEXICO CITY

MIAMI

MILAN

MOSCOW

OSLO

PARIS

ROME

SAN DIEGO

STOCKHOLM

TEL AVIV

TOKYO

TORONTO

WASHINGTON DC

ZURICH

# Supplemental Information to Interfor's Final Report of March 27, 2008

## May 1, 2008

## CONFIDENTIAL

**Prepared for:**     Mark D. Petersen, Esq.
Farella Braun & Martel LLP

575 MADISON AVENUE, SUITE 1006, NEW YORK, NY 10022  T. 212 605 0375  F. 212 605 0118  INFO@INTERFORINC.COM   WWW.INTERFORINC.COM

## RESTRICTED USE WARNING

This report was prepared by Interfor, Inc. at the request of the client to whom it is furnished. The client agrees that reports and information received from Interfor, Inc. are strictly confidential and are intended solely for the private and exclusive use of the client. It is not to be released or shared with others without the prior written permission of Interfor. Interfor has made its best effort to ensure the accuracy of the information contained in the report. However, Interfor has relied, in part, on databases and secondary sources which may be inaccurate and may not be able to substantiate the validity of specific information in the report. The report may be orally modified with additional information. The client agrees to indemnify Interfor and hold it harmless against any damages or claims resulting from the use of information contained in this report. Interfor should therefore be consulted before the client relies on specific information contained in the report.

This document contains and is based upon confidential communications by and between attorney and client, or it contains mental impressions, conclusions, theories and/or strategies of counsel or other representatives of the company developed in anticipation of or presentation for litigation. Do not copy, distribute or disclose except as authorized by counsel.

**PRIVILEGED & CONFIDENTIAL**

## Supplemental Information

Interfor was retained by Mark D. Petersen, Esq. of Farella Braun & Martel on March 5, 2008 to conduct a discreet, confidential due diligence investigation on Raymond A. Mirra, Jr. Interfor presented its Final Report on the subject to Mr. Petersen on March 27, 2008.

In the Final Report Interfor stated that sources were continuing to investigate Raymond Mirra and Louis Schipani's affiliations with organized crime. Interfor has now received confirmation that Raymond Mirra and Louis Schipani are on file with the US government as "associates of organized crime". Interfor's sources have determined that this is a very broad, family-based affiliation and not a criminal affiliation. There have been no Federal criminal investigations, indictments or convictions with respect to organized crime for either Mr. Raymond Mirra or Mr. Schipani.

In addition, Interfor's sources confirmed that Raymond Mirra has not been the subject of an organized crime-related investigation in New Jersey or Pennsylvania.

- 1 -

INTERFOR | INC